May it please the Court. My name is Julie Mersh, and I represent the appellant, Mia Decovich. I would like to reserve two minutes for rebuttal. Just watch the clock. I will, Your Honor. Thank you. The district court erred when it determined that CDS, Appelli's claims advisory agent, made a reasonable determination that Ms. Decovich had not met her burden to prove that she was disabled and, therefore, entitled to long-term disability benefits. We ask the Court to reverse the district court's determination and render judgment in Ms. Decovich's favor. I wanted to ask you about that because you have that in your brief, too. Let me tell you what gives me some difficulty about it. I think everybody agrees that the district court's review is de novo in this case, correct? Yes, Your Honor. If the district court's review is de novo, the question isn't, I think, whether or not the administrator or its agent made a reasonable determination. If the district court's review is de novo, the question is whether or not there's a question of fact in the case, correct? Isn't that what Kearney says? Yes, Your Honor. And in this particular situation, it appears that the judge did rule on cross-motion and considered my Rule 52 motion as a motion for summary judgment. In the order itself, however, he doesn't rule on cross-motion. The order says the order concludes that the administrator was reasonable. And if we were and if the court below were exercising review with deference, if we were looking at this, if this were not a de novo review case, but rather a case of review with deference, that might be an appropriate conclusion. But in a de novo review case, that's not the question, is it? The question of reasonableness, which is what I was confused about a little bit with the Court's order, Your Honor. Right. So the question in a de novo review case is whether or not, looking at all the evidence in front of the administrator, there's a question of fact. If there is a question of fact, then the district court conducts its own factual inquiry looking at the record and reaches its own conclusion. And you're saying that looking at this record, only one conclusion can be reached, which is that your client is disabled? What I would argue, Your Honor, is that at a minimum, there are genuine issues of material fact that require that. Well, and I understand that argument. But you just said to us we should remand with instructions to enter judgment in your client's favor. And that, as I understand our standard of review, would require that in looking at this record, we would say that reasonable people could only conclude that your client was disabled. And given the reviewing doctors and the opinions of at least some of the doctors, I don't see how we could possibly do that. Could we? Well, Your Honor, based on your comment, I would rather that we remand the case and saying that there are genuine issues of material fact. My position, as I argued to the court, lower court, was that there was, under the Rule 52 motion, which the court did not expressly rule upon, was that there was that my client had carried her burden of proof on the issue of disability. The court, in its order, however, wrote that both motions for summary judgment were denied. So proceeded to the court said I'm denying both motions for summary judgment, which suggests to me that looking at the record, the court couldn't say a reasonable person could rule either way, the court says, looking at the record. The court granted the appellate motion for summary judgment. But that's my point. You really can't come to us today and say the court should have granted your motion for summary judgment, can you? Well, I didn't really file a motion for summary judgment. I know. But so let's turn to what relief might be available to you. If, in fact, there is a question of fact in this case, given that we had de novo review, then the district judge should conduct a hearing on the record. That's what Kearney says. You don't allow additional evidence. You look at the record and then you make your own conclusions of law and find it's a fact. District judge shouldn't do that here, but the district judge ruled against you, thinking you didn't even have enough evidence to create a finding of fact, a triable issue of fact. Aren't you going to lose? If we send it back to the district judge and say, conduct a trial on this record that you didn't think even raised an issue. Well, and that's why I wanted to argue why I believe the court erred in concluding that there were no issues of fact. Well, let's assume I agree with you. Let's assume that I think that Dr. Sai's report, I don't know how to pronounce the name, TSAI, is enough to create an issue of fact on disability, even though he later sort of renounces it. So that gets you a trial in front of the district judge. The district judge looks at the same record that was in front of the administrator, the same record on which you guys argued summary judgment, and then makes a factual determination about disability. And I can't also argue that you're not just arguing it was unreasonable. I understand that you're arguing also that there was a procedural issue and that the final determination was based on a ground that had not been served up to your client, and therefore she didn't have fair notice and fair opportunity when they shifted from, in your argument, shifted from manifestation symptoms of fibromyalgia being sufficient to disabled, but also that somehow it was all really the primary problem of your client was that she had psychiatric problems. That's correct, Your Honor. I'm reading through, and I don't see that articulated in the initial letter. So that would be a procedural issue. That is correct. It can't be fact-based unless to the extent one could determine whether or not the facts show your client got fair notice. That's correct, Your Honor. And the lower court actually based its ruling in large part on my client's failure to prove a particular type of disability. Your client wasn't claiming psychiatric disability. No, she was not. And she's not claiming it now. Absolutely not. So what if we just what if we tell the district court on remand it has to ignore that issue? Because you're not claiming it, you never tried to prove it. And more importantly, the definition of disability does not require us to prove a particular type of disability. Right. But you put in all the evidence you wanted to of disability, did you not? I tried to, Your Honor, yes. At the administrative agency. Yes, Your Honor. I tried to do that. So isn't the issue now looking at that evidence, should disability be found? Let me correct the statement I made. I did not represent. I meant Ms. Of course. I don't know if you meant at the administrative level. I meant Ms. Dekovich. Ms. Dekovich introduced at the administrative level all the evidence she wished to about her disability. As well as she understood what she was supposed to introduce. Okay. But she never claimed a psychiatric disability. No, Your Honor. When she was referred by one of the doctors to a psychologist or psychiatrist, she refused to go. Well, refused. She did not go. Declined to go. Although fibromyalgia, as this Court has recognized, is a physical, not a mental disease, and to the extent that there's nothing in the record to suggest that if she had gone for psychological care, that would have been appropriate. No. And I'm just following up on Judge Fischer's questions. Let's assume that the administrator shouldn't have considered psychological or psychiatric issues. What does that take us in this case? Don't we just simply remand and tell the district judge? Don't ignore that stuff because it never was noticed. How can you ignore what the major ground of the final determination is based upon? I'm not sure I understand what you're being asked. Well, since Judge Fischer is asking me a question, let me tell you what I'm asking you. Normally, if a district court makes a finding, makes a finding and says, I'm basing my conclusion on A and B, and we say B is wrong, you can't rely on it, we send it back and say, okay, only consider A. Is that what you're seeking here? Your Honor, I would happily accept that remand. To allow myself to be able to argue that the Court did not consider all the evidence on the issue of disability and specifically did not seek the restrictions and limitations from the doctors if they were not satisfied with Dr. Tsai's report, they never asked my client to submit restrictions and limitations, and they never directly asked the specialist. Well, now, counsel, let me see. I apparently am ‑‑ I've read the same record from a slightly different point of view. My understanding is that both sides agreed that she had fibromyalgia. Am I right or wrong about that? Yes, Your Honor. Okay. As well as all her other reported symptoms. So the only question then was, was there sufficient evidence of functional impairment? And my understanding is that the ‑‑ Ms. Dekovich was given the opportunity to establish functional impairment, in other words, what she could do and what she couldn't do, and she failed in the burden of proof on that. Am I wrong? Well, the court and the administrator said that she fell on the burden of proof, but I would respectfully submit that she did everything she could to show functional impairment. You may recall in the record, she actually had her roommate call and say, what do I need to prove to show I'm unable to work? And the response from the agent, the adjuster, was repeating sending ‑‑ that they were looking at medical records and sending them to peer review. So ‑‑ But did she ever suggest that these are the things I could no longer do, this is what I could do, therefore I'm impaired? Well, Your Honor, I know you're aware of the medical source statement that she submitted by and through Dr. Tsai on June 1, 2010, on appeal. And it's a very lengthy statement. And they came up with that statement themselves because I believe Ms. Dekovich was struggling to try to determine what do I need to present so they'll have a full and fair hearing. And the medical source statement is very specific as to what she can and can't do. What do we do with ‑‑ we had Dr. Tsai's statement, initial statement alone. It would seem to me to demonstrate some ‑‑ demonstrate the records of functional impairment and therefore create a fact issue. What do you do with what, when the reviewer calls Dr. Tsai and says, do you still stand by your statement, initial one, and he checks the box that says, I would defer to the later people? Well, Your Honor, I want to make sure we're clear. Dr. Gendron, the peer reviewer, was not asking for restrictions and limitations. The premise of the statement was, do you agree with Dr. Baker's statement that the origin is of a ‑‑ she has a psychiatric disability as opposed to a physical disability? Or would you rather ‑‑ And let's assume I accept your point that I don't care the origin of the disability. It's just the question is whether it disables her from working. Do you take that checking of the box to say, I only agree with Dr. Baker on the source of the disability, not on the ‑‑ not on ‑‑ Dr. Baker also seems to say, I don't see any reason why she can't work. That's all ‑‑ that is not true. As I put out ‑‑ as I put, respectfully, as I put in my briefs, at the beginning of the claim, there are notes in the record as of March 31, 2010, where Dr. Baker says her primary disability is fibromyalgia. It's in the record at page 29 of the excerpts. The evolution of her claim during the pendency of her medical situation, during the pendency, worsened. Her psychiatric condition worsened. The cite by Dr. Gendron in July of 2010 from Dr. Baker's notes, not from Dr. Baker's conversation with Dr. Baker, is to the effect, okay, right now, the disability is psychiatric in nature. It's the primary disability. But it wasn't the primary disability when she made her claim. It has worsened. And this goes back to the issue of what is disability? How do you prove disability? Is it a sickness or an injury? To answer your question, I didn't mean not to, deferral. I do not take Dr. Sy's checking of the box, yes, as a deferral, meaning the restrictions, limitations I set forth in my attending physician statement at the outset of the claim, in the subsequent letter that was supposed to be sent to Dr. Genoux after ‑‑ But what about Dr. Genoux? Yes, Your Honor. What about Dr. Genoux? Dr. Genoux is a rheumatologist. Dr. Genoux, if you recall, after the first reviewer's report, it went back to CDS and they said send it to the rheumatologist for comment. Yes, but his testimony is, or his report, as I understand it, is that Ms. Stokovich was not functionally impaired. Am I reading that incorrectly? I believe you are, Your Honor. He said the focus was that she has impairment. He thinks at this point ‑‑ he says impairment that's preventing her from doing her regular job. Now, understand, the letter was in response to the posit by Dr. Gendron that, hey, Dr. Baker is saying that it's psychiatric in nature. Do you agree or not? He says the muscular manifestations are preventing her from performing her regular job. But please understand, Dr. Genoux was never asked to comment on what her restrictions and limitations were. Even though CDS was supposed to ask him to do that. That is at the first claim review level. You wanted to save some time for rebuttal, so I'm going to save you. Would you sit down and say it? Thank you for saving me. You have 58 seconds. Thank you, Your Honor. I'll talk fast. You have to. Good morning, Your Honors. Anna Martin on behalf of Anthem Life Insurance Company of America, if it please the Court. I'd like to address, first of all, the idea about the psychiatric disability and how that arose. At first, the notion that plaintiffs should have been under the care of a psychiatrist arose initially in June 2010 when Dr. Baker said that she, he believed she had a psychiatric illness and that he also at that time believed that she was under the care of a psychiatrist. In March when she was claiming of dementia, he believed it was pseudodementia. It was based on a psychiatric illness. And he also believed that her insomnia was due to a psychiatric condition. But then by June when he determined that she was not under psychiatric care, he expressed surprise. And then he believed that she should be referred to for psychiatric care and that he declined to provide her any further treatment. Dr. Genoux, long before he was contacted by Anthem in June of 2010 as well, referred plaintiff to a psychiatrist. And then we have also Dr. Milligan who independently again referred plaintiff to a psychiatrist in June of 2010 and refused further treatment. So in this case, we have a consensus of treating physicians. I don't doubt that there's plenty of evidence in the record that the treating physicians think the problem may be psychiatric as opposed to fibromyalgia. There's also conflicting evidence in the record. What Judge Fisher asked you before is what concerns me. The initial letter declining doesn't talk about psychiatric issues, but the final letter, final decision does. So how could she have responded to the psychiatric concerns not knowing that the insurer was worried about them? Well, I mean, again, to me this is kind of a red herring in the sense of she's not making a psychiatric claim. The policy requires that she be under the regular and appropriate care of a physician during the benefit qualifying period, which is 120 days, and then through her disability. It also excludes any disability for which the insured is not under reasonable and appropriate care. She did not follow her doctor's advice. So she's not making a psychiatric claim. So what do we do with the declination of coverage because you haven't proved a psychiatric claim? We just ignore that? It's a red herring, you shouldn't have put it in there? She's not making the claim. She hasn't proved it. She doesn't meet the policy definition of regular and appropriate care. She would need to be under the care of a medical health care provider. Let's go back to the question I started with in this case and tell me where I'm wrong because I reread Kearney last night and Judge Kleinfeld deserves a medal for putting together a majority in that case. I think he had 14 different judges for different parts of the opinion. But as I read it, what it says is that when we do de novo review, when the district court does de novo review, and we all agree that's what it does here, if there's any fact question that in effect would have prevented summary judgment had the case been directly tried to the district judge, the judge should then move on and have a trial based on the record before the administrator. Do we agree on that? Yes. So why doesn't Dr. Sy's report raise a question of fact? He says she's got fibromyalgia and I think it disables her from her job because she has to sit at her job. There's lots of reports to the contrary, and Dr. Sy may backtrack a little later, but if I were a trial judge and I had that in front of me, I'd say, well, that's enough to get past summary judgment. You might well lose on the merits, but you get past summary judgment. Why isn't that the result we should reach here? Okay. I'm going to take the first part of your question second, and I'm going to address Dr. Sy first. Sure. The opinions that Dr. Sy gave, I think what is really paramount here is that you can take an opinion at face value, but you also are entitled to look behind that opinion. Well, on summary judgment, don't we have to take the opinion at face value? I don't. I disagree. I mean, the court made a specific finding using a summary judgment standard that Dr. Sy had deferred his opinion. Dr. Sy was the family practitioner. He didn't perform examinations. He coordinated her care, and he referred her to physicians. The fact that he deferred to the specialist makes perfect sense in this case. If you also look at his medical source statement that he signed and that he later defers from that, it's not based on any record, on any contemporaneous record. There is no substantiation for Dr. Sy's opinion. Other than the fact that he wants to assist her in getting benefits. Well, it may be a terrible opinion. It may be the finder of fact may be entitled to ignore it or discount it or whatever. But doesn't it create — isn't it enough on a summary judgment standard to create an issue of fact? I don't believe so, because I think the court made a specific finding that he deferred his opinion. And I think, again, this would be creating a straw man. You're going to send a case back to the court to conduct a review of the same record. Yeah, but that's what Judge Kleinfeld said was the problem in Kearney. That's the system we've constructed. On the district judge, do you agree with me that the district judge made the wrong finding? The district judge said, I find that what the administrator did was reasonable.  I mean, I agree. Reasonableness would pertain to an arbitrary and capricious standard. But at the same time, just espousing an incorrect standard is not enough unless it's substantially incorrect. And this is a case in which we have such a consensus of medical opinion that the court went through and made very specific findings that are supported by the record. And all of her physicians refused to provide further treatment for her. For her physical condition, which, I mean, that is overwhelming in and of itself. And the fact that Dr. Say may come in with a report that really isn't even his medical opinion. All he states in his report is that plaintiff claims she can't stand for prolonged periods of time. He did not return probably six telephone calls to him. I mean, he was a doctor who was doing what he could to help his patient, which is common. But it doesn't go enough to create a tribal issue of fact in this case, and it doesn't go enough. Which doctor are you referring to? This was Dr. Say. Say, yeah. And TSAI, I'm not sure how you pronounce it. No, I am not. So in this case, it was not enough. I mean, this case overwhelmingly demonstrates that she could not, from a physical standpoint, and we haven't even talked about just all the other factors in this case, that she didn't pursue physical therapy a year before she went out on disability. She didn't pursue referral to pain management. And in terms of knowing that we needed restrictions and limitations, she absolutely knew that. CDS Anthem's claims administrator notified her by telephone. And the day that they rendered the initial decision, they talked about it, and her roommate said, none of the doctors will give her a form for Social Security that sets forth restrictions and limitations. They refused to do it. CDS calls her again and tells her information that they would consider looking at. And sends a letter to follow up and says, look, we need a letter in writing to say that we can talk to your roommate, and please consider providing this information. She doesn't provide this information. I mean, there is just too much indicia here of not a disability, rather than possibly someone in who Dr. Genoux said, you know, might be motivated to obtain benefits. And that's what we have here. She should have followed up with a psychiatrist. She should probably still be under psychiatric care. But an insurer cannot make a claimant pursue a claim that they don't want to make. And she's not making that claim, and she cannot satisfy the reasonable and appropriate treatment term of the plan. What, in your view, what kind of evidence should she have submitted in the administrative proceeding? I mean, this is speculation. I'm not suggesting that it would have met her case. Just give me a hypothetical of what somebody in her situation would have been able to present, given that everybody seems to agree she's got fibromyalgia. I think what you would normally see in a record is somebody going to physical therapy, somebody going to pain management. If you have a doctor, if you have all your doctors telling you you need to see a doctor, what you typically see in these files are patients who are following their doctor's advice and really demonstrating the steps to alleviate these purported, you know, debilitating pain that she claims to have. I mean, she's not doing anything. And then on a phone call, she told CDS that all the doctors want to do is medicate her and not treat her. And that is absolutely false. The doctors were trying to get her to go to treatment, and she wouldn't do it. Now, that's a different question. Let me try it again. Here's somebody – no, it's okay. There's lots of facts in this case, and both sides want us to know. You've got somebody who the doctors seem to agree has fibromyalgia. The doctors seem to agree she has fibromyalgia. Both you're reviewing doctors. Nobody disputes that. Reaches that conclusion. Her job involves sitting as a card dealer. Standing. Standing. I'm sorry, as a card dealer. And she says, I can't stand given my fibromyalgia. So what additional evidence would you expect somebody to put in to show that she was disabled from performing this particular job? I think the things that I told you before is the following. But those are things that might be – those are things you might do to remedy it. I'm trying to figure out. Well, perhaps what Judge Hurwitz is looking for is a statement which confirms that she can't stand. As I understand your argument, there was representations to the doctors she couldn't stand, but the doctors couldn't confirm that. Am I misreading it? Right. And the doctors really – I mean, what we have is the record, and what we have are the phone calls where the doctors would not support her physical disability. All right. Okay. And so I'm not – I'm not sure you would have doctors supporting her physical disability. If there were some functional impairment, it would have to be confirmed that she couldn't stand more than 30 minutes at a time or she had some other condition which would prevent her from maintaining her normal work routine. Yes. Yes. And she never offered that, as I understand it. None of that was offered. And the other thing that's interesting, even with her – Can I just pursue that? I'm sorry, Your Honor. I'm going back to look at the initial denial with the – and it says that, although you have self-reports of pain and have been diagnosed with fibromyalgia, the medical evidence does not provide objective data. Okay. Now, fibromyalgia cannot, as we've learned as a court over the years dealing with this disease that wasn't even classed as a disease, is that fibromyalgia is highly subjective. It's – so when I get to a statement of objective data, I'm wondering, well, what's the objective data? That your condition rises to the level of a functional impairment. And then I go to Cy's medical source statement, which is responsive to that, presumably, and it goes through – and I'm no expert on this, believe me – but standing, there are limits about standing, the problems, and so on and so forth. Now, you're saying because he checked the box and deferring to others who are coming along with, say, oh, this is all psychiatric, what kind of weight are we supposed to give that? He's the one who looked at her condition and submitted what I would consider to be objective confirmation based on treating a fibromyalgia patient. So you're talking about unreturned phone calls and all of this. I'm looking at it from someone who is protected under a disability plan, and what is she supposed to interpret here? Because then when it comes back in the final denial, basically saying, well, yes, you have fibromyalgia, but it's really psychiatric. It's also – and you suggested that what she should have converted this to was a psychiatric claim. Is that ultimately your position? I don't think that she could make a claim that she doesn't believe she has. So she can't make a psychiatric claim if she doesn't believe she has it, and she can't establish it in any event because she wasn't under the regular and appropriate care. Dr. Say, even though he was not actually treating her for fibromyalgia, she carried that diagnosis, but he was sending her out to specialists. She was being treated by Dr. Genue for fibromyalgia, who withdrew that treatment. And in terms of objective findings, the things in this file that are very interesting is every single objective test came back normal. But the other thing that's compelling is that her physical examinations were incredibly normal. She had full range of motion of every peripheral joint of her cervical, thoracic, and lumbar spine. She had no loss of muscle strength, muscle tone, no atrophy. But doesn't this all – and I say again, you may have the world's most compelling case, but if Dr. Say thought differently, even mistakenly, even because he was only a GP, even because he loved his patient, why doesn't his opinion at least get her to the jury, in effect? I think because at the end, like the Court found, I mean, he deferred it. And if you look behind his opinion again, it is – there's no substance to it. He doesn't examine her. He prescribes medication. He coordinates her care. Let me ask the question slightly differently, and I take your point. Does his opinion – on its face, does his opinion state the objective support? I don't think it even – I don't think it on its face provides a support, because he is basically reiterating her statements and not providing his own opinion and medical backup for that opinion. Can I just ask – I have one question. Oh, certainly. Dr. Genoux came up, and the denial letter, the final denial letter says that he doesn't support her claim. And yet I read in his September 17, 2010 letter at ER 36, he's responding to Dr. Gendron, my diagnosis would be severe depression with musculoskeletal manifestations. Those manifestations are impairing her ability to perform her regular job. It would be difficult to differentiate fibromyalgia pain versus musculoskeletal pain from depression. I would incline to believe at this point her physical complaints are related to her severe depression, less likely due to fibromyalgia. But in fact, he is acknowledging that she does have disabling pain, and that's not the same thing as saying she doesn't have the kind of pain that is disabling. But, again, she is not under the regular and appropriate care. But that's not – you didn't turn her down for that reason. You've said that several times. But the letter that turns her down doesn't say, well, you're not – we're turning you down because you're not under the regular and appropriate care of a physician. It says we're turning you down because you have no functional impairment. We're – okay. So first, with respect to Dr. Genoux, he declined further treatment of her. And at the end of that letter, he also raises the point that she could just be trying to get benefits in his last sentence. I understand that. But I asked a different question. I said you're – you didn't turn her down because she wasn't under the regular and appropriate care of a physician for 120 days, did you? Can I – can I – No, just – I think it's a yes or no. I don't believe it is a yes or no. The letter – basically, we raised that notion. Dr. Genoux found a psychiatric disability. We raised the issue in the letter that we confirmed she hadn't seen a psychiatrist. So there's nothing for us to review. Does the letter that went – And the psychiatric policy provision. I'm sorry. Okay. We're talking over each other. Does the letter that went to her, that turned her down, tell her that we're turning you down because you're not under the regular and appropriate care of a physician for 120 days? No. But what it does do – the answer to that is no. And – but what it does do is it talks about that if she had a psychiatric disability that we confirmed she didn't have records. There was nothing for her to supply. There was nothing for us to review. And we do cite the regular and appropriate care provision in the decision after appeal letter. Thank you, counsel. Your time has long expired. Thank you very much. Thank you. Ms. Mersh. Thank you, Your Honor. You have just under a minute. I'll hurry. Your Honor, I just – Your Honors, I just want to address quickly the reliance on CDS and counsel that she did not go to physical therapy. I believe it's a red herring that any physical therapy would have assisted with fibromyalgia complaints. But more importantly, the question is whether CDS or Anthem ever asked the treating physicians to explain whether a fibromyalgia patient with the inability to stand or the purported inability to stand for more than 15 minutes would even show atrophy of the limbs. And how long would it take before you even saw atrophy of the limbs? Or would a fibromyalgia patient show loss of muscle tone or loss of range of motion? As noted by Dr. Howard and the American Board of Rheumatology, the signal points of fibromyalgia are widespread tenderness, widespread pain, and long-term discomfort, which Dr. Howard agreed that she had. So I want to make the point that I'm not so certain that a referral to physical therapy would have done anything to alleviate her treatment and her pain. The other thing I must insist upon is that the deferral by Dr. Tsai, I do not believe that Dr. Tsai was retracting any of his statements in the medical source statement regarding her restrictions and limitations. I think at that point, after the third time, he probably was very eager to let somebody else take over the restrictions and limitations. And Dr. Genoux was never specifically asked, what are the restrictions and limitations? His comments were related to, Dr. Baker, we're telling you, thinks it's psychiatric in origin. So do you agree? And tell me. He said, well, at this point, I think it is psychiatric in origin, but I still think, as Judge Fischer has said, that she cannot perform her regular occupation because of her sickness. I would submit that. Counsel, is there anything in the record which confirms her ability or her lack of ability to stand? Other than, well, there are the statements, her statements, her eloquent statements. Well, her. The question is confirmed. You heard the colloquy with your opposing counsel, and she suggests that the, that Ms. Dikovich asserts her ability, her disability to perform her work because she can't stand very long. But nobody has confirmed that. I would respectfully disagree. Dr. Tsai in the medical source statement confirmed it. But he referred it to somebody else. He agreed. He did not make that determination himself, did he? He filled out and certified, saying these are true and correct statements to the best of my ability, in the medical source statement that she was unable to stand, could only stand on an 8-hour day for more than 4 hours a day. I mean, treating physicians are not typically going to do functional capacity evaluations in the office, so. All right. Well, thank you very much. To answer your question, I, there was, that was all that was there, other than her statements as well, Your Honor. Very well. Thank you very much. The case just argued will be submitted for decision.
judges: O'scannlain, Fisher, Hurwitz